DAVIS WRIGHT TREMAINE LLP
1633 Broadway
New York, New York 10019
Tel.: (212) 489-8230
Fax: (212) 489-8340
Elizabeth A. McNamara (EAM 1987)
Christopher J. Robinson (CR 9165)
*Attorneys for Plaintiff Advanced Magazine Publishers, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



-------------------------------------------------------x

ADVANCE MAGAZINE PUBLISHERS, INC.   :
d/b/a THE CONDE NAST PUBLICATIONS,   :

               Plaintiff,   :

     -against-   :

ZAP ZONE NETWORK, MAIL CENTRO, INC.   :
and CP SOFTWARE GROUP   :

            Defendants.   :

-------------------------------------------------------x

07 Civ.

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Advance Magazine Publishers, Inc. d/b/a The Conde Nast Publications

("AMPI"), by and through its attorneys, Davis Wright Tremaine LLP, alleges as follows for its

complaint against Zap Zone Network, MailCentro, Inc. and CP Software Group (collectively,

"ZZN"):

## NATURE OF ACTION

1.    This action seeks injunctive relief and damages against defendants for: (i) willful

infringement of federally registered trademarks, as well as common law trademarks, in violation

of the United States Trademark Act of 1946, as amended, 15 U.S.C. § 1051, *et seq.*; (ii) dilution

of federally registered trademarks, as well as common law trademarks, in violation of the Federal

Trademark Dilution Act of 1995, as amended, 15 U.S.C. § 1125(c); (iii) federal unfair

competition in violation of Section 43(a) of the United States Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a); (iv) related claims of unfair competition, dilution and deceptive trade practices in violation of the laws of the State of New York and common law; and (v) contributory infringement of AMPI's trademarks.

2.     AMPI is the publisher of many of the most recognized magazines in the world, including *Vogue*, *Teen Vogue*, *Glamour*, *Conde Nast Traveler*, *Wired*, and *Details*. AMPI is the owner of famous and distinctive federal and common law trademarks in the names of those magazines, among others.

3.     Defendant Zap Zone Network claims that it "delivers free email to more than 3 million email boxes and 350,000 individual websites in 128 countries around the world." To help generate the millions of email boxes – and to maintain its lucrative advertising and other revenue lines – Zap Zone Network and its related entities maintain a database of email addresses incorporating famous trademarks, including AMPI's world famous marks, offer those addresses to consumers for use, and then leverage the value of those marks by driving advertising to the owners of those email addresses. Despite repeated requests by AMPI to ZZN to remove the addresses containing AMPI's marks, ZZN willfully continues to offer and maintain such infringing marks in its database.

4.     Plaintiff brings this action to put an end to defendants' infringing acts and seeks to enjoin defendants from offering and using to attract advertising revenue variations of AMPI's marks as part of their customer's email addresses, with an intent to trade on the value of AMPI's intellectual property, resulting in confusion and significant injury to AMPI's goodwill and reputation.

## THE PARTIES

5.     Plaintiff AMPI is a corporation organized under the laws of the State of New

York, with its principal offices located at Four Times Square, New York, New York 10036.

6.      Upon information and belief, defendant Zap Zone Network, is a wholly owned subsidiary of defendant MailCentro, Inc. and is organized under the laws of the State of California.  Upon further information and belief, defendant Zap Zone Network regularly conducts business in New York.

7.      Upon information and belief, defendant MailCentro, Inc. is a corporation organized under the laws of the State of California, with its operating offices in Folsom, California.  Upon further information and belief, MailCentro operates Zap Zone Network.

8.      Upon information and belief, defendant CP Software Group is a privately-held corporation organized under the laws of the State of California, with its operating offices in Folsom, California.  Upon further information and belief, CP Software Group manages both MailCentro, Inc. and Zap Zone Network.

9.      Upon information and belief, defendants regularly conduct business in New York, in that a number of defendants' customers are based in New York and defendants provide services directly to customers based in New York.

## JURISDICTION AND VENUE

10.     This action arises under 15 U.S.C. §§ 1051-1127 (the "Lanham Act"), New York General Business Law §§ 349 and 360-L, and the common law of trademark and unfair competition, as more fully set forth below.  This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. § 1121.  In addition, this Court has jurisdiction over these claims under the principals of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over defendants because upon information

and belief, defendants conduct business in the State of New York and have otherwise committed infringing acts in New York, causing injury to plaintiff who is a New York corporation.

12.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because upon information and belief, a substantial part of the events giving rise to the claims alleged herein occurred in this judicial district and New York.

## FACTUAL BACKGROUND

### AMPI'S Trademarks and Websites

13.    AMPI is a publishing company, whose magazines have a combined circulation of over 17 million per month worldwide, and they are estimated to reach more than 180 million people per year. Most of its magazines are known in the industry as "general interest" publications, because they appeal to and are read by a broad demographic of readers.

14.    Since 1892, AMPI and its predecessors-in-interest have published and widely sold and distributed throughout the United States and abroad the women's fashion and style magazine *Vogue*. The trademark VOGUE is one of the most valuable and well-known brands in the fashion, beauty and publishing industries. The first VOGUE trademark (No. 69,530) was registered with the federal government in 1908 for magazines. AMPI holds eight other registrations for VOGUE trademarks registered in various classes (Registration Nos. 3,069,976, 2,701,928, 1,659,761, 1,666,656, 1,336,659, 504,006, 125,542 and 103,770). AMPI also holds federal trademark registrations for at least twenty-five other trademarks that incorporate the term "Vogue", including the marks VOGUE.COM (No. 2,592,452), and VOGUE NOVIAS (No. 1,863,179). A copy of a print-out from the United States Patent and Trademark Office ("PTO") website of AMPI's registrations and applications for the various VOGUE marks is annexed hereto as Exhibit A.

15.    The U.S. edition of *Vogue* reaches an average monthly audience of over 1,301,468.

16.    In addition to the U.S. edition, *Vogue* is published through AMPI's subsidiaries or through local licensees in numerous countries and regions, including England, France, Germany, Spain, Brazil, Italy, Greece, Portugal, Russia, Korea, Taiwan, China, Japan, Australia and Latin America. AMPI owns over 1,000 trademark registrations worldwide for VOGUE in connection with magazines and online publications and distribution of information. A trademark report showing AMPI's worldwide registrations for VOGUE is annexed hereto as Exhibit B.

17.    Since 2000, AMPI or its predecessors-in-interest have also published and widely sold and distributed throughout the United States and abroad the teen-focused magazine *Teen Vogue*. AMPI owns several registrations and applications for TEEN VOGUE trademarks in several classes, including Serial Nos. 76,651,319 and 7,661,344, Registration Nos. 3,134,461, 2,934,621, 2,770,479, 2,770,478, 2,793,299, 2,914,890, 2,835,164 and 2,568,246 (which was registered in the PTO on May 7, 2002). A copy of a print-out from the PTO website of AMPI's registrations and applications for the TEEN VOGUE marks is annexed hereto as Exhibit C.

18.    *Teen Vogue* reaches an average monthly audience of 972,555.

19.    Since 2005, AMPI or its predecessors-in-interest have also published and widely sold and distributed throughout the United States and abroad the magazine for men, *Men's Vogue*. AMPI owns several registrations and applications for MEN'S VOGUE trademarks in several classes, including Serial No. 7661345 and Registration No. 3,146,090 for the mark MEN'S VOGUE for publications. A copy of a print-out from the PTO website of AMPI's registrations and applications for the MEN'S VOGUE marks is annexed hereto as Exhibit D.

20.    *Men's Vogue* reaches an average monthly audience of 300,000.

21.    Since 1939, AMPI or its predecessors-in-interest have also published and widely sold and distributed throughout the United States and abroad the women's magazine *Glamour*. AMPI owns numerous registrations and applications for the GLAMOUR marks including Registration No. 407,439, which was registered in the PTO on June 6, 1944. A copy of a print-out from the PTO website of AMPI's registrations and applications for the GLAMOUR mark is annexed hereto as Exhibit E. The GLAMOUR mark has been used on and in connection with the magazine of the same title since May 1, 1941.

22.    The U.S. edition of *Glamour* reaches an average monthly audience of 2,248,961.

23.    Like *Vogue*, *Glamour* is published through AMPI's subsidiaries or through local licensees throughout the world, including the United Kingdom, France, Holland, Spain, Italy, Germany, Greece, Poland, Hungary, Russia, South Africa and Latin America. AMPI also owns over 300 trademark registrations worldwide for GLAMOUR, a report of which registrations is annexed hereto as Exhibit F.

24.    Since 1993, AMPI or its predecessors-in-interest have also published and widely sold and distributed throughout the United States and abroad the technology news and information magazine *Wired*. AMPI owns numerous registrations and applications for WIRED trademarks in several classes, including Serial No. 76,661,349, Registration Nos. 3,078,104, 2,781,551, and 1,853,612 (which was registered in the PTO on September 13, 1994). A copy of a print-out from the PTO website of AMPI's registrations and applications for the WIRED marks is annexed hereto as Exhibit G.

25.    *Wired* reaches an average monthly audience of 656,453.

26.    Since 1982, AMPI or its predecessors-in-interest have also published and widely sold and distributed throughout the United States and abroad the men's magazine *Details*. AMPI

owns several registrations and applications for DETAILS trademarks in several classes,

including Serial No. 78,865,887 and Registration Nos. 1,619,890 and 2,695,667 (which was

registered in the PTO on March 11, 2003). A copy of a print-out from the PTO website of

AMPI's registrations and applications for the DETAILS marks is annexed hereto as Exhibit H.

27.     *Details* reaches an average monthly audience of 455,374.

28.     Since 1909, when Conde Montrose Nast acquired *Vogue,* the name Conde Nast

has been at the forefront of magazine publishing in the United States. AMPI or its predecessors-

in-interest have long held valuable common-law rights in the CONDE NAST mark which has

been used in commerce in the form CONDE NAST PUBLICATIONS since 1922. AMPI owns

numerous registrations and applications for CONDE NAST trademarks in numerous classes,

including Registration Nos. 1,568,296, 3,102,717, 2,761,342, 2,837,045 and 2,543,327. A copy

of a print-out from the PTO website of AMPI's registrations and applications for the CONDE

NAST marks is annexed hereto as Exhibit I.

29.     AMPI is diligent in pursuing infringers of its valuable and famous names and

trademarks.

30.     CondeNet, Inc. ("CondeNet") is an affiliated company of AMPI that is licensed to

operate websites for AMPI's magazines, as well as to use certain of AMPI's trademarks in

connection with certain Internet activities. AMPI also operates condenast.com, a website that

provides information about the magazines published by AMPI's Conde Nast division, including

subscription information and electronic links to individual websites for those magazines.

31.     The individual websites for AMPI's magazines are operated by either CondeNet,

Conde Nast or other licensees of AMPI, and include among others websites operated under the

following Internet domain names: vogue.com, teenvogue.com, glamour.com, wired.com and

wireddigital.com. In addition, CondeNet operates style.com, which is a website devoted to fashion and contains content from plaintiff's magazine *Vogue*, and men.style.com, which is a website devoted to men's fashion and contains content from plaintiff's magazine *Details*. There is also a central condenet.com website that provides links to style.com and men.style.com, as well as to AMPI's individual magazine websites and prominently displays trademarks for the majority of AMPI's magazines.

32.    Corresponding with the foreign editions of *Vogue* and *Glamour* magazines plaintiff publishes, AMPI, through its subsidiaries or local licensees, also maintains websites devoted to each of the foreign editions. A list of AMPI's international sites operated by CondeNet is annexed hereto as Exhibit J.

33.    In total, all of the websites featuring all of AMPI's magazines have more than 6 million unique users and receive more than 250 million web page views per month. Those websites prominently display AMPI's trademarks for both its magazines and its general corporate business. For example, condenast.com prominently displays the trademarks for the 17 magazines published by AMPI's division Conde Nast, including *Vogue*, *Teen Vogue*, *Men's Vogue*, *Glamour*, *Wired* and *Details*. Also, AMPI's individual magazine websites regularly include advertisements and links to sister publications, and regularly display the trademarks for those other publications.

34.    AMPI has made substantial, continuous, and exclusive use of the domain name condenast.com as the name of its Conde Nast website since 1994.

## Internet Domain Names

35.    The Internet is an interconnected network of computers that permits users to exchange information and communicate with each other electronically.  All computers connected to the Internet are assigned an identifying address known as an Internet Protocol ("IP") address, which consists of a numerical string unique to that particular computer.

36.    IP addresses are crucial to the operation of the Internet, but are difficult for human users to remember and manipulate.  Therefore, a corresponding system of alphanumeric "domain names" has been put in place that is overseen by the Internet Corporation for Assigned Names and Numbers ("ICANN"), a nonprofit organization responsible for global IP address space allocation.

37.    When searching for a particular business, or for particular products or services, on the Internet, users often deduce domain names based on the name of that business or the name of its products or services.  For instance, a user attempting to reach Conde Nast might expect to find the company by typing "www.condenast.com" into his or her Internet browser. A domain name that incorporates a company's name or trademark is thus a valuable method for a company to reach its customers or potential customers.  For this reason, companies routinely register domain names incorporating their various trademarks.

38.    In addition, businesses typically use an IP address that incorporates the name of their business as their email address.  Thus, for example, one would expect to reach an employee of Conde Nast at an email address of [person's name]@ condenast.com.  Similarly, if you receive an e-mail from a [person's name] at condenast.com, you would believe and understand that the person worked at Conde Nast.  The use of a business's name in its email address, which is used to communicate with the business's customers and the public at-large, furthers

recognition of the business and identity and association of the business with its trademark. Such use therefore is a valuable marketing tool.

## Defendants' Infringing Activities

39.    Upon information and belief, ZZN provides, among other Internet-related services, email services and support to customers. Customers interested in opening an email account with ZZN are directed to "search for an email service name in [ZZN's] directory." Upon further information and belief, ZZN maintains a directory of email service names which incorporate or have incorporated a variety of famous marks, such as STARBUCKS, PEPSI and DISNEY, as well as AMPI's marks, VOGUE, TEEN VOGUE, MEN'S VOGUE, GLAMOUR, CONDE NAST, WIRED and DETAILS. As a result, a customer interested in opening an account under AMPI's marks can search ZZN's directory for AMPI's marks, and the search will yield several email addresses available for use. For example, a search under AMPI's marks, VOGUE, GLAMOUR and CONDE NAST has yielded results that include your-name@luomovogue.zzn.com, your-name@teenvogue.zzn.com, your-name@VOGUEmail.zzn.com, your-name@glamourawards.zzn.com and your-name@condenastmagazines.zzn.com. A complete list of vanity email addresses that can be obtained or have been available through a search of ZZN's directory and that are confusingly similar to AMPI marks is annexed hereto as Exhibit K.

40.    Upon information and belief, ZZN's business model is based at least in part on offering email accounts under famous marks as described above, in order to attract and direct third-party advertisers to the home pages of those accounts. Having established a customer base utilizing famous marks, including AMPI's marks, ZZN markets to potential advertisers, offering them "several prime spots. . .to reach [ZZN's] attractive demographic of site service owners and

email end users within [ZZN's] email interface itself."

41.     Specifically, ZZN offers third-party advertisers access to its email users "by purchasing banners, pop-up and button space, and tag line messages, which are sent out with each of [ZZN's] millions of daily email messages." ZZN offers third-party advertisers advertising space on the first web page users access upon logging into their email accounts and additional space on other web pages accessed by users of ZZN's email accounts.

42.     ZZN's offer and maintenance of a database of email service names which incorporate plaintiff's trademarks, constitutes a violation of AMPI's rights in and to those marks.

43.     AMPI's marks are each distinctive, and have acquired worldwide fame through AMPI's broad-based advertising, marketing and promotional efforts, as well as press coverage of AMPI's products and services.

44.     Upon information and belief, ZZN had actual knowledge of AMPI's rights in the marks set forth above, and offered, and/or continues to offer despite explicit notice, confusingly similar marks in utter disregard of AMPI's rights and in bad faith.

45.     Upon information and belief, ZZN's email service names containing AMPI's marks have caused actual or are likely to cause confusion among individuals searching for AMPI's products and services offered therein, because consumers who receive any emails from ZZN's customers using email addresses that contain AMPI's marks are likely to believe they are dealing with a representative of AMPI or of AMPI's products and services, and may believe that any communications from such ZZN customers are sponsored by or affiliated with AMPI. This confusion will cause irreparable harm to AMPI's reputation and goodwill.

46.     ZZN's actions have been and are intentional.

47.     Upon information and belief, ZZN earns substantial revenue from these email

accounts through advertising, sponsorships and click-through tracking.

### Defendants' Customers' Infringing Activities

48.     Upon information and belief, ZZN's customers have used email service names offered and provided by ZZN in order to improperly associate themselves to AMPI and/or AMPI's goods and/or services.

49.     For example, in or about April 2007, a ZZN customer, "Sabine Schmidt" attempted to pose as an employee or associate of *Vanity Fair*, a publication owned by AMPI, and sent an email under the address, sabineschmidt@condenast.zzn.com, to AMPI's German subsidiary, Conde Nast Verlag, which publishes a German edition of *Vanity Fair*, requesting photos for an alleged upcoming issue of *Vanity Fair* in the United States. This incident resulted in actual confusion as to whether the email address sabineschmidt@condenast.zzn.com related to any Conde Nast entity.

50.     Furthermore, upon information and belief, ZZN also provides website services and support, which allow users who have set up email accounts with ZZN to post content on web pages associated with their email accounts. Specifically, upon information and belief, users of email accounts set up under AMPI's marks have posted content on the web pages associated with their email account that is likely to cause confusion with AMPI's properties. For example, a customer interested in joining a ZZN email account under the VOGUE name is taken to a site to register for email service that contains images of fashion-related accessories, suggesting an association with AMPI's *Vogue* magazine. A copy of a print-out of that site is annexed hereto as Exhibit L.

51.     ZZN's customers, as described above, do not have any legitimate purpose for using email service names that incorporate AMPI's famous trademarks. On good faith belief,

given the above-described improper uses of AMPI's trademarks by ZZN customers, AMPI has every reason to suspect that customers who register email accounts containing AMPI's trademarks with ZZN use such accounts for the sole purpose of improperly associating themselves with AMPI and/or AMPI's goods and services.

<u>**Defendants' Willful Behavior**</u>

52.     Upon discovery of ZZN's and ZZN's customers' infringing acts, AMPI notified ZZN of such behavior and have made several demands that ZZN remove from its directory any offerings of email accounts under AMPI's trademarks and to cease support of its customers' email accounts that are infringing upon AMPI's trademarks. Despite such express notice, ZZN has refused to do so. To date, ZZN continues to maintain AMPI's marks in its directory and support the infringing email accounts.

53.     Furthermore, since AMPI's last demand, ZZN has acted even more egregiously by not only refusing to remove from its directory those email service names containing AMPI's trademarks and continuing to promote and offer to sell the infringing domain, but ZZN had also added additional infringing domains including: your-name@LEGAL.VogueEspaniol.zzn.com, your-name@LEGAL.VogueEspanol.zzn.com, your-name@LEGAL.condenastinternational.zzn.com and your-name@LEGAL.condenastmagazines.zzn.com.

<u>**AS AND FOR A FIRST CLAIM FOR RELIEF**</u>

**(Infringement of Registered Marks, 15 U.S.C. § 1114)**

54.     The allegations of paragraphs 1 through and including 53 are incorporated as if fully set forth herein.

55.     AMPI's registered trademarks are each distinctive and/or famous. That

distinctiveness and/or fame has been enhanced further through widespread use in advertising, which has exposed the trademarks to millions of people worldwide. Defendants, with actual or constructive notice of AMPI's federal registration rights under 15 U.S.C. § 1072, and long after AMPI had commenced use of the federally-registered marks, registered and used Internet domain names and vanity email addresses that copy and incorporate AMPI's federally-registered marks in interstate commerce in a manner that has caused and is likely to cause confusion, deception, and mistake among consumers.

56.     AMPI has never consented to defendants' use of its distinctive and famous registered trademarks.

57.     Defendants' use of email service names incorporating AMPI's registered marks is also likely to cause confusion among consumers.

58.     Defendants' actions constitute a violation of 15 U.S.C. § 1114 (1).

59.     Defendants have caused AMPI irreparable harm, and unless enjoined, defendants' continued offer and use of email service names containing AMPI's marks will continue to cause irreparable harm to AMPI.

## AS AND FOR A SECOND CLAIM FOR RELIEF

### (Federal Trademark Dilution, 15 U.S.C. § 1125(c))

60.     The allegations of paragraphs 1 through and including 59 are incorporated as if fully set forth herein.

61.     Each of AMPI's registered and common law marks is famous and/or distinctive, and their fame and/or distinctiveness has been enhanced by the widespread use and promotion of the goods and services with which they are associated. AMPI has used its marks for years and has extensively promoted them throughout the world.

62.     Defendants offered and used the email service names at issue after AMPI's federal and common law marks had become famous and distinctive.

63.     Defendants' commercial use of the email service names at issue is likely to confuse consumers as to the source, sponsorship or affiliation of said services and blurs and tarnishes the distinctiveness of AMPI's trademarks.

64.     Defendants' commercial use in commerce of the email service names at issue dilutes AMPI's trademarks in violation of 15 U.S.C. § 1125(c).

65.     Defendants' conduct has caused, and will continue to cause, AMPI irreparable injury, leaving AMPI with no adequate remedy at law.

## AS AND FOR A THIRD CLAIM FOR RELIEF

### (Federal Unfair Competition, 15 U.S.C. §1125(a))

66.     The allegations of paragraphs 1 through and including 65 are incorporated as if fully set forth herein.

67.     Defendants' actions described above constitute unfair competition, false designation of origin, false or misleading descriptions or representations of fact, false advertising and/or unfair or deceptive trade practices, in that they are likely to cause confusion or cause mistake, or to deceive others as to the origin, sponsorship or approval of defendants' activities, all in violation of 15 U.S.C. §1125(a).

68.     As a direct and proximate result of the foregoing acts, practices and conduct of defendants, AMPI has been and is likely to be substantially injured in its business, including its reputation, resulting in lost revenues and profits, and diminished goodwill and reputation.

69.     AMPI has no adequate remedy at law because its marks are unique and represent to the public AMPI's identity, reputation and goodwill, such that damages alone cannot fully

compensate AMPI for defendants' misconduct.

70.    Unless enjoined by this Court, defendants will continue to unfairly compete, falsely designate the origin of their goods, make false descriptions or representations, and use AMPI's marks to cause confusion, all to the irreparable injury to the business, identity, goodwill and reputation of AMPI.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

### (Common Law Unfair Competition)

71.    The allegations of paragraphs 1 through and including 70 are incorporated as if fully set forth herein.

72.    Defendants' acts and practices as above-described have been undertaken with the intention of benefiting from and profiting upon AMPI's marks.  This goal is accomplished by the use of the slight variations of AMPI's trademarks in defendants' email service names, which use is intended to lead and tends to lead the public to believe that there is a connection or association between defendants and the owners of AMPI's marks, when in truth and in fact there is none.

73.    Upon information and belief, defendants will make a profit as the direct result of their above-described actions, which were undertaken with malice towards AMPI, and/or in wanton, willful and reckless disregard of AMPI's rights.

74.    Defendants' actions as above-described injure AMPI's reputation and goodwill, expressly mislead the public by falsely imputing a connection or relationship between defendants' email service names and AMPI, cause AMPI to suffer financially, and constitute unfair competition in derogation of the common law.

75.    By reason of the above-described acts, defendants have engaged in unfair competition under and pursuant to the laws of the State of New York and have caused, and will

continue to cause, AMPI irreparable harm, leaving AMPI with no adequate remedy at law.

## AS AND FOR A FIFTH CLAIM FOR RELIEF

### (Trademark Dilution Under N.Y. Gen. Bus. Law § 360-L)

76.    The allegations of paragraphs 1 through and including 76 are incorporated as if fully set forth herein.

77.    The registered trademarks owned by AMPI possess a truly distinctive quality and have acquired secondary meaning in the mind of the public as a source of quality magazines, and other goods and services sold under those marks.

78.    AMPI's trademarks, on the one hand, and the email service names at issue, on the other hand, are strikingly similar, and both are used in connection with Internet websites.

79.    Defendants' actions as described above have been undertaken without the consent of AMPI and with the predatory intent of benefiting commercially from an association with AMPI's trademarks.

80.    AMPI's trademarks are nationally and internationally renowned as a result of their long and exclusive use, AMPI's substantial expenditures for advertising and promotion, licensing and trademark policing, and unsolicited media coverage.

81.    Because the use of email addresses to conduct communications and/or other business that is not associated with the actual business of AMPI and its goods and services is inconsistent with the carefully designed marketing objectives of AMPI, defendants' above-described acts will dilute and/or are likely to dilute the distinctiveness of AMPI's marks by tarnishing the affirmative associations that the marks have come to convey, damaging the reputation of those marks, and cause financial injury to AMPI.

82.    Because defendants use confusingly similar variations of AMPI's trademarks,

consumers are likely to be confused as to the source, sponsorship or affiliation of defendants' services and said use will dilute and/or is likely to dilute the distinctiveness of those marks by lessening their capacity to signify goods and services emanating from AMPI.

83.    By reason of the above-described acts, defendants have diluted and/or is likely to dilute AMPI's trademarks in violation of § 360-L of the New York General Business Law, leaving AMPI with no adequate remedy at law.

## AS AND FOR A SIXTH CLAIM FOR RELIEF

### (Deceptive Acts and Practices Under N.Y. Gen. Bus. Law § 349)

84.    The allegations of paragraphs 1 through and including 83 are incorporated as if fully set forth herein.

85.    Defendants' use of AMPI trademarks, and the reputation and goodwill associated therewith, as described above, constitute unfair, willful and deceptive trade practices in violation of N.Y. General Business Law § 349.

86.    As a direct and proximate result of the foregoing acts, practices and conduct of defendants, AMPI has been and is likely to be substantially injured in its business, including its reputation, resulting in lost revenues and profits, and diminished goodwill and reputation.

87.    AMPI is entitled to recover treble damages pursuant to N.Y. General Business Law § 349.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF

### (Contributory Trademark Infringement)

88.    The allegations of paragraphs 1 through and including 87 are incorporated as if fully set forth herein.

89.    Defendants induce third-party users to purchase email accounts using email

service names containing AMPI's marks by directing users to select such names from defendants' directory.

90.    Defendants knew or had reason to know, and were put on notice, that such email accounts were being used by third-party users in a manner that infringed AMPI's rights.

91.    Third-party users who have contracted with defendants to use email service names containing AMPI's famous marks are infringing AMPI's rights by such use.

92.    Despite explicit notice of the improper use of AMPI's marks, defendants continued to offer email service names containing AMPI's marks to third-party users and to support their email accounts.

93.    Defendants' acts constitute contributory trademark infringement.

94.    Defendants' and third parties' conduct has caused great and irreparable damage and injury to AMPI, leaving AMPI with no adequate remedy at law.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF

### (Contributory Dilution)

95.    The allegations of paragraphs 1 through and including 94 are incorporated as if fully set forth herein.

96.    Defendants' acts of inducing third-party users to purchase email accounts using email service names containing AMPI's marks by directing users to select such names from defendants' directory and refusal, despite repeated notice, to remove such email service names from their directory, with the knowledge that third-party users were using such email accounts in dilution of AMPI's marks constitute contributory trademark dilution.

97.    Defendants' and third parties' conduct has caused great and irreparable damage and injury to AMPI, leaving AMPI with no adequate remedy at law.

## AS AND FOR A NINTH CLAIM FOR RELIEF

### (Vicarious Infringement)

98.     The allegations of paragraphs 1 through and including 97 are incorporated as if fully set forth herein.

99.     By providing the technical and operational support of email accounts under email service names containing AMPI's marks, and by the terms of its own services, ZZN has the authority to exercise control over the infringing email accounts owned by the third-party users.

100.    Defendants are therefore liable for vicarious trademark infringement.

101.    Defendants' conduct has caused great and irreparable damage and injury to AMPI, leaving AMPI with no adequate remedy at law.


**WHEREFORE**, AMPI requests that judgment be entered against defendants, as follows:

A.     Enjoining and restraining defendants and all those acting under each of their direction or pursuant to their control, or in active concert or participation with them from:

    (i)     using or otherwise exploiting the email service names listed in Exhibit K;

    (ii)     offering, using or otherwise exploiting any email service name that incorporates any trademarks owned by plaintiff or any trademarks that are identical or confusingly similar to trademarks owned by plaintiff;

    (iii)     doing any other acts or things calculated or likely to cause confusion or mistake in the mind of the public, to dilute plaintiff's trademarks, or to lead Internet users or consumers into the belief that defendants' products or services come from or are the products or services of plaintiff, or are somehow sponsored or underwritten by, or affiliated with, plaintiff, and from otherwise unfairly competing with plaintiff; and

    (iv)     using any false designation of origin or false description which can or is likely to lead the public, or individual members thereof,

erroneously to believe either that any product or service manufactured, distributed, offered for sale, sold, licensed, sponsored, approved, endorsed, or authorized by defendants was manufactured, distributed, offered for sale, sold, licensed, sponsored, approved, endorsed, or authorized by plaintiff, or that defendants or their affiliates are affiliated, connected or associated with plaintiff.

B.    Directing that defendants remove from their databases and/or directories every email service name that incorporates any trademarks owned by plaintiff or any trademarks that are identical or confusingly similar to trademarks owned by plaintiff, and take all actions necessary to stop the functioning of all such email accounts;

C.    Ordering defendants to account to plaintiff for their profits arising from the foregoing acts of infringement, dilution, unfair competition and deceptive business practices.

D.    Awarding plaintiff judgment, pursuant to 15 U.S.C. § 1117 and N.Y. Gen. Bus. Law § 349, for the greater of:

    (i)    Three times plaintiff's damages, in an amount to be determined at trial; or

    (ii)    Three times defendants' profits, in accordance with the accounting demanded in the preceding paragraph.

E.    Awarding plaintiff its costs, including its reasonable attorneys' fees and disbursements in this action, pursuant to 15 U.S.C. § 1117.

F.    Awarding plaintiff punitive damages pursuant to the law of the State of New York in view of defendants' intentional and willful infringement of plaintiff's trademarks; and

G.    Granting plaintiff such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       September 7, 2007

DAVIS WRIGHT TREMAINE LLP

By: _____
    Elizabeth A. McNamara (EAM 1987)
    Christopher J. Robinson (CR 9165)
    1633 Broadway
    New York, NY 10019
    (212) 489-8230

*Attorneys for Plaintiff*
*Advance Magazine Publishers, Inc.*
*d/b/a The Conde Nast Publications*